575 So.2d 101 (1989)
Ruben Max MALONE
v.
CITY OF SILVERHILL.
1 Div. 918.
Court of Criminal Appeals of Alabama.
September 29, 1989.
Rehearing Denied February 23, 1990.[*]
James W. May, Gulf Shores, for appellant.
Don Siegelman, Atty. Gen., and Venessa Campbell, Asst. Atty. Gen., for appellee.
TAYLOR, Presiding Judge.
The appellant, Ruben Max Malone, was convicted of driving under the influence of alcohol, in violation of § 32-5A-191(a)(2), Code of Alabama 1975. He was sentenced to one year of unsupervised probation and ordered to pay a fine in the amount of $500.00.
The facts tended to show that on the evening of April 16, 1988, after a long day of doing yard work, the appellant went to the Sea and Steak restaurant in Loxley, Alabama, for dinner. While there, he drank an unknown amount of "Canadian Mist and Seven-Up" and ate a catfish dinner. After having been at the restaurant for approximately three hours, the appellant *102 left and began the ten-minute drive back to his home in Silverhill, Alabama.
Officer Fred Freeman was patrolling Baldwin County Road 55, the road on which the appellant was traveling, when he observed the appellant's truck stopped at a four-way stop for an unusually long period of time. His suspicions aroused, Officer Freeman followed the appellant for three-quarters of a mile and observed his vehicle cross the center line several times. At this, Officer Freeman turned on his blue lights, and the appellant pulled off the road.
The appellant exited his truck, but had to hold to the bed of the truck as he walked. As Officer Freeman approached the appellant, he smelled alcohol on the appellant's breath. Officer Freeman asked to see the appellant's driver's license and also asked if he had been drinking. The appellant answered, in a somewhat slurred voice, that he had been drinking.
Based on the foregoing, Officer Freeman decided to administer the Horizontal Gaze Nystagmus (HGN) test to the appellant. The test results indicated that he had been consuming alcoholic beverages. Officer Freeman placed the appellant under arrest for reckless driving and driving under the influence of alcohol. He was then taken to the county jail.
The appellant raises two issues on appeal.

I
The appellant first contends that the evidence regarding HGN test performed on him by Officer Freeman was inadmissible at trial because he argues, it did not satisfy the test for admissibility of novel scientific evidence set out in Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923). During trial, a hearing was held pursuant to the appellant's motion to suppress the evidence. The trial court, after hearing Officer Freeman's testimony regarding the HGN test, denied the motion to suppress.
The question of the admissibility of this type of evidence is a matter of first impression in this jurisdiction. First, the general acceptance of the HGN test in the scientific community must be considered. We must next determine whether, in this case, a proper foundation was laid for the officer's testimony concerning the appellant's HGN test results. Finally, if we hold the HGN test results to be inadmissible, then we must consider whether there was enough evidence to convict the appellant of driving under the influence of alcohol without the positive HGN test results.
In Frye, the court held in pertinent part:
"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

Frye, supra, 293 F. at 1014 (emphasis added).
Nystagmus, a well-known physiological phenomenon, has been defined and described in Webster's New Collegiate Dictionary (1980), Dorland's Illustrated Medical Dictionary (25th ed.1974), 7 Encyclopedia Britannica, Micropaedia (15th ed.1974), and Stedman's Medical Dictionary (5th Lawyer's ed.1982). The fact that nystagmus can be caused by the consumption of alcohol is also accepted by the medical profession.
"Jerk nystagmus ... is characterized by a slow drift, usually away from the direction of gaze, followed by a quick jerk of recovery in the direction of gaze. A motor disorder, it may be congenital or due to a variety of conditions affecting the brain, including ingestion of drugs such as alcohol and barbiturates, palsy of lateral or vertical gaze, disorders of the vestibular apparatus and brainstem and cerebellar dysfunction." (Emphasis added.)
*103 The HGN test has been in use for approximately 30 years. The test was apparently introduced by law enforcement agencies in the western states in the 1960's when police noticed that barbiturate users' eyes moved in quick jerks. Later, the HGN test was employed in drunk driving prosecutions in eastern jurisdictions. Its use became so widespread that the United States Department of Transportation outlined the appropriate procedures for administering the test, in its National Highway Traffic Safety Administration Bulletin DOT HS 806 512. Annot., 60 A.L.R. 4th 1129, 1131 (1988).
In State v. Superior Court In and For Cochise County, 149 Ariz. 269, 718 P.2d 171, 173 (1986), the court explained that the HGN test is administered by police officers as follows:
"In the HGN test the driver is asked to cover one eye and focus the other on an object (usually a pen) held by the officer at the driver's eye level. As the officer moves the object gradually out of the driver's field of vision toward his ear, he watches the driver's eyeball to detect involuntary jerking. The test is repeated with the other eye. By observing (1) the inability of each eye to track movement smoothly, (2) pronounced nystagmus at maximum deviation and (3) onset of the nystagmus at an angle less than 45 degrees in relation to the center point, the officer can estimate whether the driver's blood alcohol content (BAC) exceeds the legal limit of .10 percent."
The court further held, after extensive research, which was listed in an appendix, that there had been sufficient scrutiny of the effects of alcohol on nystagmus to permit a conclusion as to the reliability of the HGN test. The court concluded:
"We find that the HGN test satisfies the Frye standard. The evidence demonstrates that the following propositions have gained general acceptance in the relevant scientific community: (1) HGN occurs in conjunction with alcohol consumption; (2) its onset and distinctness are correlated to BAC; (3) BAC in excess of .10 percent can be estimated with reasonable accuracy from the combination of the eyes' tracking ability, the angle of onset of nystagmus at maximum deviation; and (4) officers can be trained to observe these phenomena sufficiently to estimate accurately whether BAC is above or below .10 percent."
State v. Superior Court, supra, 149 Ariz. at 279, 718 P.2d at 181. After having reviewed the appendix referred to above, we are satisfied that the holding of the Arizona Supreme Court is a correct one. We therefore adopt this standard as our own.
After having established that the HGN test is generally accepted by the scientific community and thus satisfies the Frye test, we must now determine whether a proper foundation was laid in the case at bar for the officer's testimony concerning the HGN test results. The record reads, in relevant part:
"Q. Officer Freeman, I believe you had just testified that you administered a test to Mr. Malone by the side of the road?
"A. Yes.
"Q. What test did you administer?
"A. The Horizontal Nystagmus Gaze Test.
"Q. And in layman's terms, what is that test?
"A. It's just a test that is given to determinewell, it is a test that is given and it gives the person who is giving the test an opportunity to observe the movements of the subject's eyes that is taking the test. And the way his eye moves tells the person giving the test whether or not that person has been consuming alcohol.
"Q. Have you had training in the administration of this test?
"A. Yes, ma'am.
"Q. Where did you receive that training?
"A. I received this training while I was a police officer in the State of Tennessee at a DUI seminar.
"Q. And for what length of time were you trained in the administration of this test?
"A. Eight hours.

*104 "Q. Did you successfully complete that training program?
"A. Yes, I did.
"Q. Tell the ladies and gentlemen of the Jury what you specifically did with respect to Mr. Malone on this occasion.
"A. To administer this test to Malone, I took my pen and held it in front of his face so he could see the point of the pen, I instructed Mr. Malone not to move his head but to simply follow the movement of my pen with his eyes only. And at this time, I also had my flashlight shining so I could watch his eyes.
"And when the test is given, what you are looking for is jerky movements of the eye, kind of like a windshield wiper blade on a dry windshield, it is just going to be a jerky movement. If the jerky movement is present, it is an indicator, as I stated, that the person has been consuming an alcoholic type beverage because the desired effect is just a smooth flow of the eye.
"Q. And would the smooth flow of an eye be the eye of someone who had not been drinking?
"A. That is what it would determine to the person giving the test.
"Q. Now, this test is not totally exclusive. There are other things that can cause a jerky eye movement; is that correct?
"A. Yes, there are.
"Q. But it is indicative if there is no other reason for it that a person has been consuming alcohol?
"A. As I already stated, I smelled the smell of an alcoholic beverage about his person, and the way he exited the vehicle, and with these facts at hand, I decided to give the Horizontal Nystagmus Gaze Test.
"Q. And specifically what did you observe about Mr. Malone's eyes when you administered the test?
"A. I observed his eyes to move in jerky horizontal movements."
In our opinion, this was an inadequate foundation for the admission of the testimony regarding the test results.
"Whenever scientific evidence (as we broadly use that term here) is offered, the first inquiry is whether it adds to the likelihood of the proposition to which it is directed. This, of course, is the simple test of relevance. But with evidence of a technical nature, there is special concern: the trier might give undue weight to this evidence since it may appear to lend the certainty of an exact discipline to problematic factfinding. This concern is manifested in at least two cautionary judicial principles. First, there must be foundation evidence showing that the tests and procedures employed in adducing the scientific results were performed and followed in accordance with the accepted standards of the discipline in question. Second, courts require a degree of recognition within the field or profession that the assumptions, principles or scientific laws that underlie the results are considered sound."
G. Lilly, An Introduction to the Law of Evidence 407 (1978). See also People v. Vega, 145 Ill.App.3d 996, 99 Ill.Dec. 808, 496 N.E.2d 501 (1986) (testimony of state trooper who stopped defendant concerning validity of HGN test to determine alcohol impairment provided inadequate foundation for admission of results).
Officer Freeman, whose only specialized training in this area was an eight-hour course on the proper use of the HGN test, was, at most, qualified as an expert in giving the test. The state offered no other evidence to demonstrate the reliability of either the HGN test or the scientific principle upon which the HGN test is based, i.e., that alcohol consumption causes nystagmus. We, therefore, find that the court erred in receiving Officer Freeman's testimony concerning the HGN test. Haggermaker v. State, 466 So.2d 193 (Ala.Cr.App. 1985). See also Commonwealth v. Miller, 367 Pa.Super. 359, 532 A.2d 1186 (1987) (testimony of police officer, whose only specialized training in the area was a two-day course on correct use of HGN test and other field sobriety tests, was inadequate foundation to show that the scientific principles upon which the HGN test is based are accepted in the scientific community, so *105 as to make testimony of the officer concerning the results of test performed on motorist inadmissible).
While receipt of the HGN test was error, it does not result in our reversing the conviction for driving under the influence of alcohol. The evidence contained in the record was overwhelming. Estes v. State, 358 So.2d 1050 (Ala.Cr.App. 1977), cert. denied, 358 So.2d 1057 (Ala. 1978). See also State v. Reed, 83 Or.App. 451, 732 P.2d 66 (1987); State v. Leonard, 151 Ariz. 1, 725 P.2d 493 (Ariz.App.1986). The language of § 32-5A-191, Code of Alabama 1975, sets out the measure of proof. A person is guilty of violating subdivision (a)(2) of that section if he drives a vehicle under the influence of alcohol, "as to affect his ability to operate a vehicle in a safe manner." Ex parte Buckner, 549 So.2d 451 (Ala.1989). Officer Freeman testified that the appellant was driving erratically, i.e., in an unsafe manner, could not walk on his own, smelled of alcohol, had slurred speech, and admitted that he had been drinking. Moreover, both the appellant and the owner of the Sea and Steak testified that the appellant had consumed an unknown amount of "Canadian Mist and Seven-Up" over a three-hour period. This is sufficient evidence to convict the appellant of driving under the influence of alcohol.

II
The appellant next contends that the trial court erred in permitting the arresting officer to state his opinion as to whether the appellant was under the influence of alcohol to the extent that his ability to operate a motor vehicle was impaired.
This court has held on numerous occasions that an arresting police officer's opinion as to the sobriety of the defendant at the time of the arrest is admissible in a prosecution for driving under the influence. Specifically, in Grimes v. State, 488 So.2d 8, 9 (Ala.Cr.App.1986), this court stated:
"A search of D.U.I. cases in Alabama reveals that a police officer is allowed to give his opinion as to the sobriety vel non of the appellant. See Pierson v. State, 31 Ala.App. 452, 18 So.2d 578 (1944); Pate v. State, 35 Ala.App. 586, 50 So.2d 796 (1951); Gladden v. State, 36 Ala. App. 197, 54 So.2d 607 (1951); Durham v. State, 38 Ala.App. 341, 83 So.2d 260 (1955); Holloway v. City of Birmingham, 56 Ala.App. 545, 323 So.2d 726 (1975); Ex parte Bush, 474 So.2d 168 (Ala.1985)."
Furthermore, in Jolly v. State, 395 So.2d 1135 (Ala.Cr.App.1981), this court went a step further by allowing a lay witness to express an opinion as to the sobriety of a person. This court held:
"Intoxication is a matter of common observation which requires no peculiar scientific knowledge. 31 Am.Jur.2d Expert and Opinion Evidence, Section 101 (1967). The general principles controlling opinion testimony on intoxication are stated in 23 C.J.S. Criminal Law § 866 (1961).
"`It has been broadly declared, or the principle has been broadly applied, that any witness may express his opinion as to intoxication, that opinion testimony as to intoxication is not limited to expert testimony, and may be given by lay witnesses, and that intoxication or sobriety need not be proved by expert testimony, since it does not require any particular or special knowledge. The witness must have had a suitable opportunity, even though slight, for observation; the conditions under which the witness observed the person in question, and the opportunity to observe him, go to the weight, and not to the admissibility, of the testimony. It has been required that evidence be admitted showing that any witness who is asked to express an opinion as to accused's intoxication is properly qualified.'"
Jolly, supra, 395 So.2d at 1143. Pursuant to the above cases, there can be no dispute that Officer Freeman correctly expressed his opinion as to the sobriety of the appellant.
Based on the foregoing, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
*106 TYSON and McMILLAN, JJ., concur.
BOWEN, J., dissents with opinion and PATTERSON, J., joins in dissent.
BOWEN, Judge, dissenting:
I dissent. Without the HGN test result, the evidence was sufficient to convict the appellant of DUI, but it was not overwhelming.
The officer testified the appellant's speech had "some slur," but "not a great deal." Appellant admitted that he had been "drinking," but denied that he was "under the influence" when he left the restaurant. There were no blood alcohol test results in evidence. These facts are a far cry from the "overwhelming evidence" found in Estes v. State, supra, the only Alabama case cited by the majority for the proposition that erroneous receipt of the HGN test result was harmless. Interestingly, in Estes, the Alabama Supreme Court denied certiorari, but observed the following: "In denying this writ, we point out that we do not necessarily agree with the Court of Criminal Appeals' holding on `harmless error.'" Estes v. State, 358 So.2d 1057, 1058 (Ala.1978).
Furthermore, "the proper inquiry here is not whether evidence of the [appellant's] guilt is overwhelming but, instead, whether a substantial right of the [appellant] has or probably has been adversely affected." Ex parte Lowe, 514 So.2d 1049, 1050 (Ala. 1987).
In view of the majority's recognition that "the trier might give undue weight to [HGN] evidence since it may appear to lend the certainty of an exact discipline to problematic factfinding," it is difficult to conclude that erroneous admission of the HGN test result did not adversely affect a substantial right of the appellant.
I would reverse and remand for a new trial.
NOTES
[*] Bowen, J., dissented from this rehearing denial, without opinion.