Clayton Cains was convicted of driving under the influence of alcohol, a violation of § 32-5A-191(a)(2), Code of Alabama 1975, and sentenced to pay a fine of $500. On appeal, he claims that he was illegally arrested and that the State did not establish the proper predicate for introduction of his blood alcohol test results into evidence.
 I
On March 13, 1988, State Troopers McGlothlin, Peacock, and Tolbert set up a roadblock on Alabama highway 59, between Stapleton and Loxley, to check for "drivers' licenses, equipment violations, persons who were driving under the influence, [and] anything that would be in violation of the law." Trooper Tim McGlothlin testified that they decided to set up the roadblock "based on problems that we were having in the area." They received approval for the roadblock from their supervisor, Corporal Larry Linden, and Linden later came by to check on the roadblock.
McGlothlin testified that he stopped every car in both the northbound and southbound lanes of traffic, asked the drivers for their licenses, and then waved them on if there were no problems. The duration of each stop was for "five, ten seconds or so, just long enough to pull out their license." When McGlothlin asked the defendant for his license, McGlothlin noticed that the defendant's eyes were "extremely bloodshot," that he acted "sluggish," and that he "looked intoxicated."
At that point, the trooper asked the defendant to pull his vehicle to the side of the road, to step out of the car, and to walk to a nearby patrol car. McGlothlin, who observed the defendant walk about 30 yards, stated that the defendant was "very unsteady on his feet," and "staggered the whole time." When the defendant got in *Page 292 
the patrol car, he had a strong odor of alcohol on his breath, he was "thick-tongued," and it was difficult to understand him. McGlothlin gave him an alco-sensor field test for sobriety and, when he failed the test, the officer arrested him for DUI. He was then taken to the Robertsdale police headquarters and administered an Intoxilyzer 5000 test. The results of that test indicated that the defendant had a blood alcohol content of .20%.
Although the defendant does not challenge the constitutionality of his initial stop at the roadblock, he claims that his being directed to pull out of the line of traffic for further inquiry constituted an arrest without probable cause in violation of his Fourth Amendment rights. We hold that no arrest occurred at that time.
Instead, the defendant was detained on reasonable suspicion of DUI pursuant to § 15-5-30, Code of Alabama 1975, and theTerry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968), line of cases. Following further observation of the defendant's condition, including his failure to pass the field sobriety test, the officer then had probable cause to arrest him for DUI and transport him to police headquarters for an intoxilyzer test. See Buchanan v. City of Auburn,512 So.2d 145, 146 (Ala.Cr.App. 1987), overruled on other grounds, Haysv. City of Jacksonville, 518 So.2d 892 (Ala.Cr.App. 1987).
Our holding that the defendant was not arrested, but merely subjected to a Terry-type detention when he was directed to the secondary inspection area for further inquiry necessarily includes the determination that his initial stop at the roadblock was permissible. If the primary stop had been constitutionally infirm, then any additional detention would, of course, have been invalid. See State v. Calhoun,502 So.2d 808 (Ala. 1986).
It is undisputed that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment]," Delaware v. Prouse, 440 U.S. 648, 653,99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). "Checkpoint stops are 'seizures,' " United States v. Martinez-Fuerte, 428 U.S. 543,556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). The Fourth Amendment requires that such seizures be reasonable. Delawarev. Prouse; Martinez-Fuerte; Terry v. Ohio. Generally, a seizure less intrusive than a traditional arrest is reasonable if based on individualized suspicion, gathered from specific and articulate facts, that the individual is, or is about to be, engaged in criminal activity, Terry v. Ohio; see also UnitedStates v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694,66 L.Ed.2d 621 (1981), or if the seizure is "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers," Brown v. Texas, 443 U.S. 47,51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).
The nature of a roadblock requires the stopping of cars without individualized suspicion of wrongdoing. Thus, if a roadblock stop is to be upheld, it must be on the second basis,i.e., because it is "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." In a series of decisions stemming from the immigration control cases, the United States Supreme Court has rejected the individualized suspicion requirement for fixed, non-random automobile checkpoints or roadblock stops, and instead has established some criteria for "a plan embodying explicit, neutral limitations on the conduct of individual officers."
In United States v. Brignoni-Ponce, 422 U.S. 873,95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court held that random vehicle stops by roving border patrols must be based on reasonable and individualized suspicion of criminal activity, but it approved, in United States v. Martinez-Fuerte, 428 U.S. 543,96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the stop of all oncoming traffic at a fixed immigration roadblock-type checkpoint in the absence of individualized suspicion. In Martinez-Fuerte, the Court observed that "the Fourth Amendment imposes no irreducible requirement of such suspicion," 428 U.S. at 561,96 S.Ct. at 3084, and it utilized a balancing approach to determine reasonableness, weighing the strong public interest in stopping the flow of illegal *Page 293 
aliens against the minimal intrusion on " 'the constitutionally protected interests of the private citizen,' " id. (quotingCamara v. Municipal Court of City and County of San Francisco,387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)). In addition to noting a lesser expectation of privacy in an automobile, the Court also found that roadblock stops "both appear to and actually involve less discretionary enforcement activity," id. 428 U.S. at 559, 561, 96 S.Ct. at 3083, 3084.
Then, in Delaware v. Prouse, the Court again focused on the critical element of "discretionary enforcement activity" by holding that a random stop, by an officer on roving patrol, of an automobile to check vehicle registration and licensing requirements violated the Fourth Amendment because it was not based on individualized suspicion. Finding that the "essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials," the Court determined that the absence of "an objective standard" for making a particular stop made random stops unreasonable. 440 U.S. at 653-54,99 S.Ct. at 1395-96. The Court concluded with the following observation, which has been the basis for roadblock stops ever since:
 "This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." Id. at 663, 99 S.Ct. at 1401 (emphasis added).
Four years later, the Court specifically approved drivers' license checkpoints in Texas v. Brown, 460 U.S. 730,103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In Brown, while the accused was detained at a roadblock the officer noticed a balloon which, based on his experience, he suspected contained narcotics. The Court upheld the seizure of the balloon and the subsequent search of the vehicle based on the "plain view" exception to the warrant requirement outlined in Coolidge v. New Hampshire,403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). For the plain view exception to apply, "[f]irst, the police officer must lawfully make an 'initial intrusion' or otherwise properly be in a position from which he can view a particular area."Texas v. Brown, 460 U.S. at 737, 103 S.Ct. at 1540; Coolidge v.New Hampshire, 403 U.S. at 465-68, 91 S.Ct. at 2037-39. Regarding the legitimacy of the officer's initial intrusion inBrown, the Court noted the following:
 "The [Texas] Court of Criminal Appeals stated that it did not 'question . . . the validity of the officer's initial stop of appellant's vehicle as a part of a license check,' [Brown v. State] 617 S.W.2d [196], at 200 [Tex.Cr.App. 1981], and we agree. Delaware v. Prouse, supra [440 U.S.] at 654-655 [99 S.Ct. at 1396]." Texas v. Brown, 460 U.S. at 739, 103 S.Ct. at 1542. (Emphasis added.)
When read together, Brignoni-Ponce, Martinez-Fuerte, Prouse, and Texas v. Brown stand for the proposition that random stops or spot checks are unreasonable in the absence of individualized suspicion of wrongdoing; on the other hand, stops at fixed checkpoints or roadblocks are reasonable if they are carried out pursuant to a neutral and objective plan, are supported by a strong public interest, and are only minimally intrusive to the individual motorist. See generally Hall,Search and Seizure § 10:31.1 (Cum.Supp. § 1986); 4 W. LaFave,Search and Seizure § 10.8(a) and (d) (2d ed. 1987); Ringel,Searches and Seizures, Arrests and Confessions § 11.6 (1986); Pellicciotti, The Law and Administration of SobrietyCheckpoints, 16 Journal of Police Science and Administration (1988), Note, Curbing the Drunk Driver Under the FourthAmendment: The Constitutionality of Roadblock Seizures, 71 Geo.L.J. 1457 (1983).
Since Prouse, sobriety checkpoints have been the subject of extensive litigation and commentary. As one commentator noted recently, as of the fall of 1988,
 "Twenty-nine state courts . . . have ruled on the constitutionality of roadblocks. *Page 294 
Nine state courts have held roadblocks to be unconstitutional; three of these courts later ruled that subsequent roadblocks were constitutional. . . . Upon reviewing the various decisions among state courts, the Florida Supreme Court called the issue an 'amorphous area.' State v. Jones, 483 So.2d 433, 437 (Fla. 1986)." Bruce, State v. Welch: Drunk Drivers, Roadblocks and the Fourth Amendment, 57 U.M.K.C.L.Rev. 29, 30 n. 8 (1988). However, "it seems fair to conclude that a DWI roadblock is constitutional if properly conducted." 4 LaFave at 70.
In balancing the gravity of the public interest in conducting DUI roadblocks against the degree of intrusion on the individual motorist, most courts and commentators have used the following three-part test set out in Brown v. Texas:
 "[A] weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." 443 U.S. at 51, 99 S.Ct. at 2640.
See, e.g. State v. Deskins, 234 Kan. 529, 673 P.2d 1174,1184-85 (1983); State v. Welch, 755 S.W.2d 624, 632-33
(Mo.App. 1988); 4 LaFave, at 71-76; Bruce, 57 U.M. K.C.L.Rev. at 35 (1988).
There is at least one factor of the balancing test on which all courts agree: the public interest in promoting highway safety by detecting, removing, and prosecuting drunk drivers is extremely great. As the Supreme Court has observed, "The slaughter on the highways of our Nation exceeds the death toll of all our wars." Perez v. Campbell, 402 U.S. 637, 657,91 S.Ct. 1704, 1715, 29 L.Ed.2d 233 (1971) (Blackmun, J., concurring). "The carnage caused by drunk drivers is well documented and needs no detailed recital here," South Dakota v.Neville, 459 U.S. 553, 558, 103 S.Ct. 916, 920, 74 L.Ed.2d 748
(1983). "Certainly, the need to identify and apprehend drunken drivers is just as clear and pervasive as the need to discover illegal aliens, which was determined to be a sufficient public concern to justify the checkpoint stops in United States v.Martinez-Fuerte. . . ." State v. Deskins, 673 P.2d at 1186-87 (Prager, J., dissenting). We do not believe this first factor is open to argument or dispute.
The only debatable questions in the sobriety checkpoint cases are whether roadblocks sufficiently advance the legitimate public interest, and whether the interference with individual liberty occasioned by a roadblock stop outweighs the public interest.
Many of the critics of DUI checkpoints have suggested that roadblock stops do not adequately promote the public interest because the problem of drunk drivers can be more effectively combated by the traditional law enforcement practice of stopping vehicles whose drivers display, by their improper driving, signs of being under the influence. See e.g., State exrel. Ekstrom v. Justice Court of the State of Arizona,136 Ariz. 1, 663 P.2d 992 (1983); State v. Koppel, 127 N.H. 286,499 A.2d 977 (1985). See also Jacobs Strossen, Mass.Investigations Without Individual Suspicion: A Constitutionaland Policy Critique of Drunk Driving Roadblocks, 18 U.C.D.I. Rev. 595 (1985).
One dissenter has concluded that, on a cost-effectiveness scale, roadblocks do not "promote the public interest in light of available less drastic alternative measures." State v.Deskins, 673 P.2d at 1187 (Prager, J., dissenting). In that case, a four-hour roadblock which stopped between 2000 and 3000 vehicles netted 15 DUI arrests and consumed 140 manhours of law enforcement time. Id.
One answer to the "cost-effectiveness," or "success-of-apprehension" argument was provided by the Supreme Court in Martinez-Fuerte when it recognized immigration roadblocks as a "deterrent to the conduct of well-disguised smuggling operations." 428 U.S. at 557, 96 S.Ct. at 3083
(emphasis added). "Certainly the deterrence function is just as important (if not more important) with respect to the problem of drunken driving. . . . [O]ne very important purpose of a DWI roadblock is 'in serving as a deterrent to convince the *Page 295 
potential drunk driver to refrain from driving in the first place.' " 4 LaFave at 74-75 (quoting People v. Bartley,109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880 (1985), cert. denied, 475 U.S. 1068, 106 S.Ct. 1384, 89 L.Ed.2d 608 (1986).)
Another answer to the "success of apprehension" argument was provided by the Missouri court in State v. Welch, when it observed:
 "Appellant's plea that only a fraction of those vehicles stopped on this particular occasion revealed operators who were intoxicated does not rise to a constitutional level. There is no necessity of numbers to establish the constitutionality validity of such operations. There is no magic and certainly no basis for holding roadblocks are unconstitutional simply because a small number of intoxicated drivers were intercepted. Indeed, it takes only one impaired driver to possibly extinguish other lives, cause serious and life-long disability, and destroy property of otherwise innocent travelers upon our roadways." 755 S.W.2d at 633.
Finally, as one commentator has noted, "The decision how police manpower should best be utilized should lie with a police administrator and not an appellate court." 57 U.M.K.C.L.Rev. at 40.
 "A particular police procedure is not necessarily ineffective or, more important, unconstitutional simply because it is not the 'best' method available. For example, the United States Supreme Court has recognized the right of police officers to make warrantless searches of automobiles, regardless of whether or not the police have the time or opportunity to obtain a warrant. [United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)]." Id.
Although the record before us contains no statistics on the number of drunk drivers apprehended at this roadblock, we do not consider the omission critical. We know that at least one impaired driver was removed from the road, and we can assume that, as a result of this and similar roadblocks in the area, other individuals under the influence of alcohol or drugs were deterred from driving. In light of testimony that the location of this roadblock was chosen "based on problems . . . in the area," we cannot say that the roadblock did not advance the public interest. In sum, we find that the location of this checkpoint was not arbitrarily chosen and it thus advanced the State's interest in highway safety to a degree that statistical evidence of "success of apprehension" is not necessary to uphold it.
We do not foreclose the possibility that other roadblocks — because of their location or manner of operation — could fail to promote the public interest. However, because "a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review," Martinez-Fuerte, 428 U.S. at 559,96 S.Ct. at 3083-84, we deem it appropriate for the defendant to establish that the particular roadblock at which he was detained did not sufficiently advance society's legitimate interest in apprehending drunk drivers, rather than to attack the efficacy of sobriety checkpoints per se.
The third factor in the balancing test requires us to examine the severity of the intrusion on individual rights caused by a roadblock stop. On this point, the Supreme Court has found that checkpoint operations present a "lesser intrusion upon [a] motorist's Fourth Amendment interests" than random, roving-patrol stops. Delaware v. Prouse, 440 U.S. at 656,99 S.Ct. at 1397.
 "[The] objective intrusion — the stop itself, the questioning, and the visual inspection — also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion — the generating of concern or even fright on the part of lawful travelers — is appreciably less in the case of a checkpoint stop." Id. (quoting Martinez-Fuerte, 428 U.S. at 558, 96 S.Ct. at 3083).
"At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." United States v.Ortiz, 422 U.S. 891, 894-95, *Page 296 95 S.Ct. 2585, 2587-88, 45 L.Ed.2d 623 (1975) (quoted inDelaware v. Prouse, 440 U.S. at 658, 99 S.Ct. at 1398).
Following this logic, many courts have held that the manner of operation and the physical characteristics of a roadblock affect the intrusiveness of a checkpoint stop. See generally
Note, 71 Geo.L.J. at 1475-79. Many jurisdictions have adopted the thirteen-factor analysis set out in State v. Deskins, 673 P.2d at 1185:
 "Numerous conditions and factors must be considered in determining whether a DUI roadblock meets the balancing test in favor of the state. Among the factors which should be considered are: (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test."
See, e.g., State v. Jones, 483 So.2d at 439 ("we follow many of our sister states in adopting the bulk of the Deskins
criteria").
While the operation of a roadblock undoubtedly bears on its reasonableness, reliance on the purely mechanical aspects of roadblock operation can lead to results which appear to elevate form over substance. For example, some courts have found roadblock stops invalid because, among other things, safety devices such as "flares, flashing lights or signs" were not used. See, e.g., Jones v. State, 459 So.2d 1068, 1079 (Fla. Dist. Ct. App. 1984). Other courts have upheld roadblocks in part because safety measures such as approach signs and traffic cones were employed, see, e.g., State v. Superior Court In andFor Pima County, 143 Ariz. 45, 691 P.2d 1073, 1076 (1984).
While such considerations are not totally irrelevant to the reasonableness of a roadblock, neither are they pivotal to its constitutionality. As the Supreme Court observed inMartinez-Fuerte, "Many incidents of checkpoint operation . . . must be committed to the discretion of [law enforcement] officials." 428 U.S. at 560 n. 13, 96 S.Ct. at 3084 n. 13.
In our judgment, roadblocks operated pursuant to an objective and neutral plan of briefly halting all oncoming traffic are only minimally intrusive to the individual motorist and are thus constitutionally reasonable seizures. The primary reason that the random stops in Brignoni-Ponce and Prouse were condemned, while the checkpoint operations in Martinez-Fuerte
and Texas v. Brown were approved, had little to do with the relatively minor mechanical operation of either kind of seizure. The approved stops were upheld because they were conducted pursuant to an "objective standard," Delaware v.Prouse, 440 U.S. at 661, 99 S.Ct. at 1400, and because they "both appear[ed] to and actually involve[d] less discretionary enforcement activity," Martinez-Fuerte, 428 U.S. at 559,96 S.Ct. at 3083. The condemned stops were invalidated because they involved the "standardless and unconstrained discretion" of officers in the field, Delaware v. Prouse, 440 U.S. at 661,99 S.Ct. at 1400.
Factors (1) and (4) of the Deskins criteria (uniform standards set by law enforcement agencies rather than by officers in the field) are based on the following observation by the Court in Martinez-Fuerte:
 "The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class." 428 U.S. at 559, 96 S.Ct. at 3083. *Page 297 
It is true in this case that the site, time, and duration of the roadblock were chosen by "officers in the field." Based on this factor alone, some courts might hold this roadblock unconstitutional. See, e.g. State v. Olgaard, 248 N.W.2d 392
(S.D. 1976) (wherein the court held that because there were no limits on police discretion in selecting the roadblock location, a warrant was required for the operation of the roadblock).
While we join the Supreme Court of Kansas in observing that "[i]t might be advisable that minimum uniform standards for the operation of vehicular roadblocks be adopted and established by [the Department of Public Safety], the legislature or attorney general, rather than leave the determination thereof to local officials," State v. Deskins, 234 Kan. at 543,673 P.2d at 1185-86, we do not believe that the field officers' decision to establish this roadblock makes it unconstitutional. First, we note that in Delaware v. Prouse the Court did not insist on a total absence of discretion by officers in the field. Instead, it "insisted that the discretion of the official in the field be circumscribed, at least to some extent." 440 U.S. at 661,99 S.Ct. at 1400 (emphasis added). Here the field officers' discretion was circumscribed by the approval they sought and received from their supervisor in setting up the roadblock and by his later presence at the site to "check on" the roadblock. More importantly, however, their discretion was limited by the neutral and objective criteria they employed in conducting the roadblock: every vehicle in both lanes of traffic was stopped and the driver was asked to show his license and was then waved on after a few seconds' opportunity for observation.
In United States v. Prichard, 645 F.2d 854 (10th Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981), the Circuit Court of Appeals upheld a roadblock stop established by officers in the field with the permission of the officers' supervisor. All westbound vehicles except semi-trucks were halted until traffic began to back up, at which time cars were waved through the roadblock until traffic cleared. The Court held the following:
 "In our view, the roadblock stop of the Ford Bronco does not run afoul of the rule of Prouse. While this may not have been a '100% roadblock' of the type referred to in Prouse, it is nonetheless a long way from the selective, single car stop denounced in Prouse. In the instant case, the New Mexico state police were attempting to stop all westbound traffic on an interstate highway, insofar as was humanly possible. The decision not to stop trucks was reasonable under the circumstances, because, presumably, they had all been stopped at a port of entry. The purpose of the roadblock, i.e., to check drivers' license and car registrations, was a legitimate one. If, in the process of so doing, the officers saw evidence of other crimes, they had the right to take reasonable investigative steps and were not required to close their eyes. See United States v. Merryman, 630 F.2d 780, 782-85 (10th Cir. 1980). Furthermore, allowing all the stopped cars through when traffic became congested was also reasonable and, in our view, nonviolative of the rule of Prouse. In sum, the roadblock stop of the Ford Bronco was, under the described circumstances, constitutional." 645 F.2d at 856-57.
In State v. Cloukey, 486 A.2d 143 (Me. 1985), the accused argued that a roadblock was unreasonable because it was conducted without a written policy or the involvement of law enforcement supervisory personnel and was, therefore, subject to being used as a "pretext" stop. The Maine court observed:
 "We are fully cognizant of the fact that a license checkpoint can be used as a subterfuge. Those state courts that have emphasized the importance of the involvement of supervisory personnel in planning a roadblock undoubtedly had that in mind. Although we recognize it is preferable, we are not persuaded that a written policy and supervision are essential. Subterfuge can occur even in the presence of such factors. The [court] below found that the purpose of the roadblock was as stated by the officers. *Page 298 
The facts and circumstances are highly corroborative of that finding." 486 A.2d at 147.
In the case before us, testimony that the officers set up the roadblock in an area where they had been having "problems" is likewise corroborated by the facts that the sobriety checkpoint was established on a well-travelled route north of the beach at the end of a spring weekend, a time and place at which it is likely that drunk drivers would be found.
Thus, although we are aware that officers could abuse their discretion in setting up a roadblock, see State v. Swift,232 Ga. 535, 207 S.E.2d 459 (1974) (license and registration roadblock at the entrance to a rock festival), we do not believe that this roadblock was characterized by such abuse or was established as a pretext or subterfuge. Moreover, as we have previously observed, "a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review,"Martinez-Fuerte, 428 U.S. at 559, 96 S.Ct. at 3083-84, and does not provide a blanket reason for invalidating all roadblocks conceived of by officers in the field.
Having determined that the roadblock at issue here was reasonable under the balancing tests set out by the Supreme Court in Martinez-Fuerte, Delaware v. Prouse, and Texas v.Brown, we hold that Trooper McGlothlin had reasonable suspicion, based on his initial observation of the defendant, to divert the defendant from the line of traffic for further inquiry as to his sobriety. Then, upon the defendant's failure to pass the field sobriety test, the officer had probable cause to arrest him for DUI and transport him to police headquarters for a blood alcohol test.
Recently, in Buckner v. City of Huntsville, 549 So.2d 451
(Ala. 1989), the Alabama Supreme Court held that in a prosecution for driving under the influence of alcohol pursuant to § 32-5A-191(a)(2), where no blood alcohol test is given, the State has the burden of proving that the defendant was under the influence "to the extent that it affected his ability to operate his vehicle in a safe manner." Buckner does not apply in this case. Here, the defendant was given a test which showed that he had a blood alcohol content of .20%, and the State relied on the statutory presumption contained in §32-5A-194(b)(3) as proof that he was "under the influence."Buckner's holding that the State must prove impaired driving ability to establish that the accused was "under the influence" applies only when the accused was charged under Section32-5A-191(a)(2).
 II
The defendant claims that the State did not establish a proper predicate prior to the introduction of the results of his Intoxilyzer 5000 test. A proper predicate for the admissibility of blood alcohol test results may be established by showing:
 "[F]irst, that the law enforcement agency has adopted the particular form of testing that was in fact used. . . . Second, there must be a showing that the test was performed according to methods approved by the State Board of Health. This may be proved by the introduction of the rules and regulations the officer followed while administering the test and the officer's testimony that he did, in fact, follow those rules when he administered the test in question. . . . Third, there must be a showing that the person administering the test has a valid permit issued by the State Board of Health for that purpose." Bush v. City of Troy, 474 So.2d 168, 170 (Ala. 1985).
The testimony of Trooper McGlothlin established the foregoing elements of the Bush predicate. The defendant objected to the introduction of the test results on the grounds of "failure to lay a proper predicate," without specifying in what respect he claimed the predicate was deficient.
 "[W]here a predicate is required for the admission of particular testimony and 'where a predicate has in fact been laid,' *Page 299 
an objection that a proper or a sufficient predicate has not been laid is a 'general objection merely, and will not be referred to any specific objection which could have been obviated if pointed out at the time.' Southern Railway Company v. Dickson, 211 Ala. 481, 487, 488, 100 So. 665, 671 (1924)." Suarez v. State, 369 So.2d 858, 862 (Ala.Cr.App.), cert. denied, Ex parte Suarez, 369 So.2d 863 (Ala. 1979).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.